UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**TIMOTHY JAMES MAYO**,                          Civil Case No. 3:12-CV-00145-KI

                    Plaintiff,

                                                OPINION AND ORDER

            v.

**PCC STRUCTURALS, INC.,** an Oregon
corporation,

                    Defendant.


            David D. Park
            Elliott & Park, P. C.
            Abernathy House
            0324 SW Abernathy Street
            Portland, Oregon  97239-4356

                Attorney for Plaintiff


Page 1 - OPINION AND ORDER

Karen L. O'Connor
Andrea H. Thompson
Stoel Rives LLP
900 S. W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

      Attorneys for Defendant

KING, Judge:

Defendant PCC Structurals, Inc. granted plaintiff Timothy James Mayo family medical leave after he told several co-workers he was thinking of killing some of his supervisors.  PCC Structurals terminated Mayo shortly after his protected medical leave ended.  Mayo alleges his termination violated Oregon's disability discrimination statute and the state and federal family medical leave acts.  Before the court is Defendant's Motion for Summary Judgment [24].  For the reasons below, I grant summary judgment against all claims and dismiss the action.

## FACTS

Mayo had been a welder at PCC Structurals for many years with no disciplinary history. At the time, the company had over 2,000 employees.  PCC Structurals has written Employee Conduct and Work Rules which state that threatening violence in the workplace is unacceptable behavior which may result in disciplinary action or termination.  Mayo and other employees had complained to company management about the harassing behavior of a supervisor, Jim Stewart, and his unrealistic performance expectations.

In early February 2011,[1] Mayo told several co-workers–Trish Cannon, Rodney Heater, and Kim Alexander–that management had unreasonable expectations, and that Mayo was going

_____

    [1]  All dates are in 2011.

to bring a gun to work and shoot several supervisors, including Jim Stewart, John Barns, and Pat Martin.  Mayo gave details to some of the co-workers, including that he would come at 1:30 p.m. because that is when all the supervisors do their walk-throughs.

The co-workers reported their concerns to Dwight Wormer, Mayo's supervisor.  Wormer asked them to document their concerns in writing, and he brought their notes to Bea Mambaje, PCC Structurals' Senior Human Resources Manager, on February 15.

Later that evening, Mambaje called Mayo at home.  He confirmed making threats to co-workers to bring a gun and kill some supervisors.  Mayo told Mambaje he could not rule out following through on the threats.  Mambaje told Mayo he was suspended until further notice. She reported the conversation to Bill Donahue, the Production Superintendent.

Shortly thereafter, Donahue contacted the Clackamas County Sheriff's Office to report Mayo's threats and conversation with Mambaje that night.  A deputy sheriff went to speak to Mayo at his home.  Mayo admitted his threats to shoot two or three supervisors, and also admitted he had suicidal thoughts and owned several guns.  The deputy voluntarily drove Mayo to Portland Adventist Hospital where he was placed on a Police Officer Mental Hold.  Mayo remained hospitalized for six days.

On March 3, PCC Structurals notified Mayo by letter that it approved his request for family medical leave beginning on February 15 and continuing to an unknown date.

Mayo has been treated for Major Depressive Disorder at Cornerstone Clinical Services, P.C., from 1999 through the events in this case.  Constance Cora Leben, a Psychiatric and Mental Health Nurse Practitioner, managed his psychotropic medication; Peter Wilson, a licensed Psychologist, had six counseling sessions with Mayo from March 14 through April 26.  Mayo

Page 3 - OPINION AND ORDER

contacted Leben for follow-up care and treatment after he was discharged from Portland

Adventist.  Mayo told both practitioners he was bullied, harassed, and demeaned at work by Jim

Stewart.  Mayo became increasingly frustrated and angry when management did not respond to

complaints about Stewart from Mayo and his co-workers, causing Mayo to voice thoughts to his

co-workers of bringing a gun to work to shoot Stewart.  Both providers believe Mayo's threats

were an expression of ruminating negative thoughts and anger, a symptom of his Major

Depressive Disorder.  On April 26, Wilson wrote a letter releasing Mayo to work.  On May 9,

Leben sent Wilson's letter to PCC Structurals, along with her own letter.  Both providers

recommended that Mayo should not work with his former supervisors.  Neither provider thought

Mayo was violent or would be a threat to others at the workplace.

Mayo then called Mambaje to confirm she received the releases from his mental health

providers releasing Mayo to return to work with the recommendation that he not work with the

same supervisors.  Mayo told Mambaje he was not sure if he was ready to return to work if he

would be required to work under the same supervisors, specifically Jim Stewart.  Mambaje told

Mayo she did not know what position he would be put in, and she would get back to him.

It was not possible for Mayo to continue to work as a welder in his department without

being supervised by one of the men he threatened.

Eileen Drake was Vice President of Administration and Legal Affairs for PCC

Structurals.  She participated in the decision to terminate Mayo, along with Mambaje.  According

to Drake, the company could have terminated Mayo immediately under company policies.  But

the group decided to take a conservative approach and put Mayo on a family medical leave after

it discussed several factors:  (1) his length of service; (2) the safety of the people Mayo

threatened, as well as the co-workers who reported the threats, if Mayo was immediately

terminated; and (3) Mayo's ability to access medical services if his health insurance coverage

was interrupted.  At the time, PCC Structurals was unaware of Mayo's Major Depressive

Disorder diagnosis.

On May 16, PCC Structurals notified Mayo his family medical leave was approved

through May 10, the end of the 12-week protected medical leave.

PCC Structurals considered Mayo to be a continuing threat to the safety of the other

workers at the plant.  On May 20, the company decided to terminate him and soon thereafter sent

Mayo the termination papers and his final check.  The company did not consider sending Mayo

for an independent psychological evaluation to determine his fitness to return to work.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact

and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

initial burden is on the moving party to point out the absence of any genuine dispute of material

fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate

through the production of probative evidence that there remains a fact dispute to be tried.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the

court "must view the evidence on summary judgment in the light most favorable to the

non-moving party and draw all reasonable inferences in favor of that party."  Nicholson v.

Hyannis Air Serv., Inc., 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (internal quotation omitted).

**DISCUSSION**

PCC Structurals argues it is entitled to summary judgment dismissing all of Mayo's claims because both the law and common sense dictate that employers cannot be held liable for discrimination when they terminate employees who openly threaten to kill co-workers at the workplace, regardless of any disability. Mayo claims there is a factual issue on whether his termination was motivated, at least in part, by animus based on his disability.

I.    Disability Discrimination

Mayo alleges PCC Structurals violated Oregon's disability discrimination statute, ORS 659A.112, when it refused to return him to his former position after he was released to work, failed to engage in an interactive process to provide a reasonable accommodation for his disability, and terminated him.

ORS 659A.112(1) makes it an unlawful employment practice for an employer to refuse to hire or promote, to bar or discharge from employment, or to discriminate in the terms, conditions, or privileges of employment on the basis of an otherwise qualified person's disability. The Oregon statute is to be "construed to the extent possible in a manner that is consistent with any similar provisions" in the Americans with Disabilities Act ("ADA"). ORS 659A.139. Because there is a great deal of case law construing the ADA, and few cases analyzing Oregon's similar statute, the parties and I rely greatly on the ADA case law.

PCC Structurals argues Mayo is not entitled to protection under the disability discrimination statutes because he was no longer a qualified individual with a disability after he threatened extreme violence. The company points out Mayo did not disclose any disability, and

thus possibly trigger a requirement for PCC Structurals to seek a reasonable accommodation, until after he threatened lethal violence.

Mayo argues conduct resulting from a disability is considered part of the disability and not a separate basis for termination. One of the few exceptions is if the employer can prove the employee is a direct threat to the health or safety of others. Mayo further argues the ADA outlaws terminations motived, even in part, by animus based on an employee's disability.

The ADA prohibits discrimination against a qualified individual with a disability. 42 U.S.C. § 12112(a). "Disability" is defined in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." Id. § 12102(2)(A). A qualified individual with a disability is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8).

To prevail on an unlawful discharge claim under the ADA, the plaintiff must establish a prima facie case by showing: "(1) he is a disabled person within the meaning of the statute; (2) he is a qualified individual with a disability; and (3) he suffered an adverse employment action because of his disability." Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 891 (9th Cir. 2001). The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law. Snead v. Metro. Prop. Cas. Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001).

I am unaware of any Ninth Circuit case law discussing situations in which an employee threatened violence against another employee. Some courts have simply said an employer can terminate an employee for making violent threats, even if the threats are caused by a disability,

because the termination is for misconduct and not a pretext for discrimination.  Macy v. Hopkins Cnty. Sch. Bd. of Educ., 484 F.3d 357, 366-71 (6th Cir. 2007), abrogated on other grounds, Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312 (6th Cir. 2012).   Other courts rely on the text of the ADA to hold that unacceptable behavior threatening the safety of others makes the employee unqualified under the ADA, even if the behavior stems from a mental disability.  Caleb v. The Gillette Co., 322 F.3d 75, 87 (1st Cir. 2003) (shouting and general threats scared several co-workers, supervisors, and the company medical staff); Sullivan v. River Valley Sch. Dist., 197 F.3d 804, 813 (6th Cir. 1999) (teacher had several disruptive and abusive outbursts, including telling school board members after they denied one of his requests that "[y]ou'll be sorry for this" and "[y]ou will regret this"); Palmer v. Circuit Court of Cook Cnty., 117 F.3d 351, 352 (7th Cir. 1997) (employee made several phone threats to the office and threatened to kill her supervisor, including "She needs her ass kicked and I'm going to do it. . . . I want Clara bad and I want her dead").

I am persuaded by the analysis that ADA protection is provided to qualified individuals with a disability, and violent threats disqualify an employee.  I adopt the analysis as my own.

Mayo relies on two Ninth Circuit cases, Gambini v. Total Renal Care, Inc., 486 F.3d 1087 (9th Cir. 2007), and Dark v. Curry Cnty., 451 F.3d 1078 (9th Cir. 2006), for their holding that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination[,]" thus making the termination a violation of the ADA.  Gambini, 486 F.3d at 1093, Dark, 451 F.3d at 1084.  Neither case, however, dealt with an employee threatening violence against co-workers.

Page 8 - OPINION AND ORDER

Gambini, who suffered from bipolar disorder, became increasingly irritable and had a hard time concentrating or assigning priorities to tasks.  In a meeting to discuss her performance issues, Gambini began to cry and shake, threw an improvement plan across the desk, and told her supervisors her opinion of the plan in a stream of profanities.  She returned to her cubicle to kick and throw things, and possibly warned the supervisors that they would "regret this."  Gambini checked into the hospital the next day and was terminated a few days later.  Gambini, 486 F.3d at 1091-92.  The court held that if "an employee demonstrates a causal link between the disability-produced conduct and the termination, a jury must be instructed that it may find that the employee was terminated on the impermissible basis of her disability."  Id. at 1093.

Dark, who had epilepsy, experienced an aura which often preceded his seizures.  He ignored the warning and reported to work, told no one of the possible problem, and suffered a seizure and fell unconscious while driving a company pickup truck.  His passenger was able to safely stop the truck.  The employer terminated Dark but gave differing reasons for the termination, causing the Circuit to conclude there was a factual issue about whether the termination was because of the disability or the misconduct of ignoring the immediate safety issue.  Dark, 451 F.3d at 1081, 1083-84.

Mayo's threats to kill his supervisors present a very different situation from that faced in Gambini and Dark in which the employees committed minor acts of misconduct.  Indeed, Dark noted the Ninth Circuit had found "egregious and criminal conduct" was an exception to its rule that conduct resulting from a disability is part of the disability.  Dark, 451 F.3d at 1084 n.3 (internal quotations omitted).  Mayo's threats to kill his supervisors fall within egregious conduct.  He not only stated the threats to several co-workers, he named specific supervisors and

the time, place, and manner of the threatened attack.  Mayo admitted to Mambaje that he could

not rule out following through on the threats.  Moreover, Gambini had explained her medical

condition to her supervisor and requested accommodations prior to her problems surfacing at

work.  Gambini, 486 F.3d at 1091.  PCC Structurals had no warning from Mayo about his

deteriorating mental state until after Mayo threatened to kill his supervisors.  I conclude a

reasonable jury would have to find Mayo was *not* a qualified individual with a disability, as

defined by the disability discrimination acts, because of his violent threats.

    Because Mayo is not a qualified individual entitled to protection under the ADA and

Oregon's disability discrimination statute, PCC Structurals does not have to fall back on proving

the direct threat affirmative defense to escape liability.  See Sista v. CDC IXIS N. Am., Inc., 445

F.3d 161, 170-71 (2nd Cir. 2006) (employee shouted at and cursed supervisor and swore "I'm

comin' for you"; direct threat defense applies when an employee poses a threat, not when an

employee actually makes a threat); Bodenstab v. Cnty. of Cook, 569 F.3d 651, 658-59 (7th Cir.

2009) (employee threatened to kill supervisor and co-workers; direct threat defense is not at issue

because employer legitimately fired employee for the threats he had already made).  Additionally,

I decline to address Mayo's arguments about pretext.  I find Mayo is not entitled to the

protections of Oregon's disability discrimination statute, and I grant summary judgment

dismissing his claim.

II.    Family Medical Leave Claims

    Mayo alleges PCC Structurals interfered with his rights under both the Oregon Family

Leave Act ("OFLA") and the federal Family Medical Leave Act ("FMLA") by refusing to

reinstate him after he was released to work and further interfered with his rights under the FMLA

by terminating him.  In his response to the summary judgment motion, Mayo withdrew his claims

for FMLA and OFLA interference.  Accordingly, I grant summary judgment against those claims

and dismiss them with prejudice.

## CONCLUSION

Defendant's Motion for Summary Judgment [24] is granted.  This action is dismissed

with prejudice.

IT IS SO ORDERED.

Dated this _____1st_____ day of July, 2013.


                                                  /s/ Garr M. King_____
                                                  Garr M. King
                                                  United States District Judge

Page 11 - OPINION AND ORDER